UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TYRIN THOMAS JR.,<br><br>Defendant. | 4:22-CR-40046-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Tyrin Thomas Jr. is before the court on a superseding indictment charging him with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846.  See Docket No. 35.  Mr. Thomas has moved to suppress certain evidence.  See Docket No. 80.  The United States ("government") resists the motion.  See Docket No. 83.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.S.D. Local Rule 57.11.

**FACTS**

An evidentiary hearing was held on May 19, 2023, in Sioux Falls, South Dakota.  Mr. Thomas was there in person along with his lawyer, Aaron Pilcher. The government was represented by its Assistant United States Attorney,

Elizabeth Ebert.  Two witnesses testified and four exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On the evening of July 25, 2022, around 10:30 p.m., Detective John Gross and Detective Nelson Leacraft were patrolling an area in Sioux Falls known for drug and gang activity in an unmarked Sioux Falls Police Department vehicle.  Docket No. 89, pp. 9, 89.  Both Detective Gross and Detective Leacraft were on the Street Crimes Unit, which was primarily tasked with tracking gang members, trying to deter gang activity, and doing drug interdiction work.  Id. at 6, 85.  While the detectives were around 5th street and Lewis Avenue in Sioux Falls, both detectives testified that they observed a black Jeep pull behind a Buick SUV.  Id. at 10, 87.  Both detectives testified that they observed a male exit the Jeep and get into the Buick and the two vehicles drove off and parked a few blocks away in a parking lot.  Id.

After a short time, the detectives observed the same male exit the Buick and return to the Jeep, and the Buick exited the area.  Id.  Shortly after, another SUV pulled into the parking lot, the same male exited the Jeep and went over to the driver's side of the SUV, and after a brief time, the male returned to the Jeep.  Id. at 10, 88.  Both detectives testified that based on their training and experience, these interactions were consistent with drug activity.  Id. at 11, 88.  Detective Gross also testified that when they ran the license plate on the Jeep, they learned it was registered to someone known to be involved in illegal drug activity in Sioux Falls.  Id.

2

After observing what both detectives believed was drug activity, the detectives started to follow the Jeep.  <u>See</u> Gov. Exhibit 1.  Detective Gross testified that while following the Jeep, he began "pacing" the vehicle to determine whether it was speeding.  Docket No. 89, p. 12.  Detective Gross defined pacing as an officer using their patrol vehicle and speedometer to estimate another driver's speed.  <u>Id.</u> at 13.  Detective Gross confirmed that pacing was something that officers learn through field training, not through any formal training.  <u>Id.</u> at 13, 45.  Detective Gross testified that while following the Jeep in a 30 mile-per-hour ("mph") zone, he drove 35 mph and observed the Jeep pulling away from him.  <u>Id.</u> at 12-13.  These speeds were confirmed by Detective Leacraft's testimony.  <u>Id.</u> at 89-90.  Detective Gross testified that all the patrol cars have a stamp specifying that the speedometer had been certified and calibrated by the manufacturer.  <u>Id.</u> at 13-14.

Both detectives testified that because the Jeep began to pull away from the patrol car while they were going a consistent speed of 35 mph, they estimated the Jeep's speed to be around 40 mph.  <u>Id.</u> at 14, 89.  Video footage from the officers' patrol camera was introduced into evidence as Government Exhibit No. 1.  If one pauses the video at various stages while the patrol vehicle is following the Jeep, the increasing distance between the two vehicles is apparent.  <u>See</u> Gov. Exhibit 1, 00:00 -00:23.  Both detectives testified that the Jeep exceeding the speed limit was one of the reasons for initiating the traffic stop.  Docket No. 89, pp. 14, 122.

While continuing to pace the Jeep, both detectives testified that they observed the Jeep slow down at 4-way intersection controlled by a stop sign and not come to a complete stop at the stop sign. Docket No. 89, pp. 14, 90; Gov. Exhibit 1, 00:32-00:43. On his body camera, Detective Gross stated that the Jeep "rolled right through" the stop sign. Gov. Exhibit 2, 00:16. Both detectives testified that they observed this failure to stop and based it on the vehicle's suspension and viewing the wheels continuing to move. Docket No. 89, pp. 14-15, 90. At this point, Detective Gross accelerated to catch up with the Jeep and activated his lights to initiate the traffic stop. Id. at 00:21-00:38.

Detective Leacraft first approached the passenger side of the vehicle with his flashlight out to look for any people or dangers in the backseat. Gov. Exhibit 4, 00:00-00:43. Detective Leacraft requested the passenger provide his identification and the defendant handed Detective Leacraft a California driver's license identifying him as Tyrin Thomas, Jr. Id. at 00:48. Detective Leacraft asked if Mr. Thomas still resided in Los Angeles and Mr. Thomas stated he recently moved to Sioux Falls. Id. at 01:36. Detective Leacraft asked Mr. Thomas why he moved from Los Angeles and Mr. Thomas suggested he moved because of his fiancé, the driver. Id. at 01:54. Detective Leacraft then asked Mr. Thomas if he was on probation or parole and Mr. Thomas confirmed he was on probation out of California. Id. at 02:30. Detective Leacraft and Mr. Thomas than began discussing growing up in Los Angeles. Id. at 03:33

Detective Gross approached the driver and looked in the backseat with a flashlight to ensure there were no safety concerns. Gov. Exhibit 2, 00:55-01:10; Docket No. 89, p. 16. Detective Gross asked the driver if she had her driver's license on her and she reached into the backseat to look through her purse. Id. at 01:19. Detective Gross testified that during this time he could smell an odor of marijuana coming from the vehicle. Docket No. 89, pp. 18-19. Detective Gross stated that he could isolate the source of the odor of marijuana was coming from the driver compartment area. Id. at 27. Detective Gross also testified that while the driver was looking in her purse for her license, he could see, in plain view, a clear ziplock bag filled with a green leafy substance that he believed, based on his training and experience, to be marijuana. Id. at 18.

Detective Gross stated to the driver that the reason for the traffic stop was a failure to come to a complete stop at the stop sign and the driver suggested that she did stop. Gov. Exhibit 2, 01:35-01:44. Detective Gross told the driver that she slowed down but did not come to a complete stop. Id. at 01:45. The driver indicated that she did not have her driver's license on her but provided Detective Gross with a card with her name on it. Id. at 02:04. The driver was identified as Lyric Tschetter. Id. at 02:11. Detective Gross requested Ms. Tschetter step out of the vehicle. Id. at 02:15. Detective Gross testified that the reason he asked Ms. Tschetter to step out of the vehicle was due to his safety concerns standing on the side of the road and because of his knowledge of the marijuana in the vehicle. Docket No. 89, pp. 18-19.

Detective Gross asked Ms. Tschetter if the Jeep was her vehicle and Ms. Tschetter explained that she recently acquired it.  Gov. Exhibit 2, 02:30. Ms. Tschetter told Detective Gross that she did not have a driver's license but had a South Dakota identification card.  Id. at 03:33.  Ms. Tschetter informed Detective Gross that the passenger was her fiancé, Tyrin Thomas.  Id. at 03:40. Detective Gross asked Ms. Tschetter if there was marijuana in the car because he smelled it and she confirmed that there was an "ounce of marijuana in her purse."  Id. at 04:01.  Detective Gross stated that he saw it while she was reaching for her purse previously.  Id. at 04:09.  Detective Gross then confirmed that Ms. Tschetter did not have a medical marijuana card.  Id. at 04:25.

Ms. Tschetter clarified that she was not on probation or parole but told Detective Gross that Mr. Thomas was on parole.  Id. at 04:34, 05:30.  Then, Detective Gross approached Detective Leacraft and stated that Mr. Thomas needed to step out of the vehicle.  Id. at 06:15; Gov. Exhibit 4, 05:58.

When Mr. Thomas stepped out of the vehicle, Detective Gross asked if he had any weapons on him and Mr. Thomas confirmed that he had a gun on his hip.  Id. at 06:40.  Detective Gross asked if he was allowed to have a gun, and Mr. Thomas admitted he was not.  Id. at 06:45.  Slightly before asking this question, Detective Gross grabbed Mr. Thomas' arm and moved it away from the gun towards Thomas' head.  Gov. Exhibit 1, 07:06; Gov. Exhibit 2, 06:42. Detective Gross then stated to Detective Leacraft that "he is on parole and has got a gun on his hip."  Gov. Exhibit 2, 06:48.  Both detectives then placed

6

Mr. Thomas' arms behind his back, placed him in handcuffs, and said that he was detained.  Id. at 06:52.  Detective Gross than asked if the gun was "legal" and Mr. Thomas explained that he was unsure.  Id. at 07:30.

Detective Gross then conducted a full pat down search.  During the search, Mr. Thomas stated that he had marijuana in his front sweatshirt pocket.  Id. at 07:52.  Mr. Thomas confirmed that he did not have a medical marijuana card.  Id. at 07:57.  When Detective Gross took the bag out of the front pocket, he held the bag up so Mr. Thomas could see it and stated, "that looks like meth right there."  Id. at 08:05; Gov. Exhibit 1, 08:31. Detective Gross then paused, Mr. Thomas said, "yep," and Detective Gross said, "that's what it is."  Id. at 08:05-08:12.  Detective Gross then found a straw with a white powder in a package and stated to Mr. Thomas, "so you got a straw in there it looks like."  Id. at 09:23.  Mr. Thomas stated there was a little cocaine in the straw.  Id. at 09:25.  Detective Gross testified that Mr. Thomas voluntarily made this statement, not in response to any questions about the straw.  Docket No. 89, p. 26.

Detective Gross asked if he had any needles and Mr. Thomas said no. Gov. Exhibit 2, 09:33.  Detective Leacraft asked Mr. Thomas if he had any syringes and Mr. Thomas said no.  Gov. Exhibit 4, 07:56.  Detective Leacraft and Mr. Thomas then continued their conversation about Mr. Thomas growing up in Los Angeles.  Id. at 08:21.

Detective Gross than asked Mr. Thomas what he was on parole for.  Gov. Exhibit 2, 09:46.  Mr. Thomas said he did not know why he was on parole and

should be on a "stricter probation." Id. at 09:48-10:01.  Detective Gross
responded by stating, "like possession of a gun by someone that shouldn't have
one or felon," and Mr. Thomas responded with "possession of gun." Id. at
10:08.  Detective Gross then asked Mr. Thomas how much money he had in
his pocket and Mr. Thomas explained that there was at least $5,000. Id.
at 10:12.

 Detective Gross than began to field test the white substance found in
Mr. Thomas' front sweatshirt pocket. Id. at 13:50.  Detective Gross stated that
the field test was positive for methamphetamine. Id. at 14:40.  During this
time, Mr. Thomas requested Ms. Tschetter to call his daughter's mother to have
her tell his daughter he would be late for dinner.  Gov. Exhibit 4, 13:00.
Detective Leacraft told Ms. Tschetter to not make the phone call for officer
safety concerns, which angered Mr. Thomas. Id. at 13:15.  Mr. Thomas was
then placed in the back of the patrol vehicle. Id. at 14:35.  Detective Leacraft
than began to search the Jeep. Id. at 17:31.

 Detective Gross called in the serial number for the firearm found on
Mr. Thomas' hip.  Gov. Exhibit 2, 28:00.  During this time, Detective Leacraft
stated to Detective Gross that he found (in his estimation) close to eleven
ounces of marijuana in the vehicle. Id. at 28:36; Gov. Exhibit 4, 26:00, 28:15.
Metro Communications then advised that the firearm found on Mr. Thomas'
person had been reported stolen. Id. at 28:53; Docket No. 83, p. 5.
Detective Gross reentered the patrol vehicle and asked Mr. Thomas if he ever
had any contact or received any tickets from the Sioux Falls Police Department.

Id. at 33:40.  Mr. Thomas shared he was recently pulled over for speeding and received a warning.  Id. at 33:44.

Eventually, Detective Gross read Mr. Thomas the Miranda[1] advisement. Id. at 39:40.  Mr. Thomas stated he understood his rights and agreed to waive them.  Id. at 39:57; Gov. Exhibit 3, 24:53.  Mr. Thomas was arrested and later charged with conspiracy to distribute a controlled substance.  See Docket No. 35.  Now Mr. Thomas moves to suppress the evidence found and the statements made during this traffic stop, arguing that the detectives did not have reasonable suspicion to initiate the traffic stop, did not have probable cause to conduct the warrantless search of the Jeep, and took statements in violation of his rights under Miranda.  See Docket Nos. 80 & 84.

## DISCUSSION

### A.    Whether the Officers had Reasonable Suspicion to Effectuate the Traffic Stop

Mr. Thomas first asserts that "Officers Gross and Leacraft lacked reasonable suspicion to stop the vehicle."  Docket No. 84, p. 4.  The government asserts that the officers had reasonable suspicion to make the traffic stop based on speeding and failing to stop at a stop sign.  Docket No. 83, p. 8.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966).

Fourth Amendment protections extend to persons in their automobiles.

Delaware v. Prouse, 440 U.S. 648, 663 (1979) (citing Adams v. Williams, 407

U.S. 143, 146 (1972)).  A traffic stop constitutes a seizure under the Fourth

Amendment.  United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004).

"[A] relatively brief encounter," a routine traffic stop is "more analogous

to a so-called 'Terry stop' . . . than to a formal arrest."  Rodriguez v. United

States, 575 U.S. 348, 354 (2015) (citing Knowles v. Iowa, 525 U.S. 113, 117

(1998); Terry v. Ohio, 392 U.S. 1 (1968)).  A Terry stop must be supported by

reasonable suspicion or probable cause.  Terry, 392 U.S. at 21-22, 27; United

States v. Holly, 983 F.3d 361, 364 (8th Cir. 2020) ("Under the Fourth

Amendment, a traffic stop is reasonable if it is supported by either probable

cause or an articulable and reasonable suspicion that a traffic violation

has occurred.")

An officer making a Terry stop based on reasonable suspicion must be

able to articulate something more than an "incohate and unparticularized

suspicion or hunch."  United States v. Sokolow, 490 U.S. 1, 7 (1989).  Officers

must have "a particularized and objective basis for suspecting the particular

person of criminal activity."  Navarette v. California, 572 U.S. 393, 396 (2014).

Reasonable suspicion in support of a Terry stop "is dependent upon both the

content of information possessed by police and its degree of reliability."  Id.

(quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

In evaluating the standard, courts must consider the totality of the

circumstances.  Id.  "[T]he constitutional reasonableness of a traffic stop does

not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007); see also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been.").

"A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." United States v. Andrews, 454 F.3d 919 at 921 (8th Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 810, (1996)). Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred. Id.; see Illinois v. Gates, 462 U.S. 213, 238, (1983); United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996).

"An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. 'This is true even if a valid traffic stop is a pretext for other investigation.' " United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)). Exceeding the speed limit provides a justifiable reason for a traffic stop, even if the officer is acting on a tip that the vehicle transports drugs and said tip would not, by itself, provide justification for the stop. Sallis, 507 F.3d at 649-650 (citing United States v. Stapleton, 10 F.3d 582, 583-584 (8th Cir.

1993)).  This is true even if the officer would not ordinarily stop a car exceeding the speed limit by only five to ten miles per hour.  Id.

Mr. Thomas attacks the detectives' credibility, stating that the detectives were travelling at inconsistent speeds when "pacing" the vehicle, the observations occurred late at night on a black vehicle, at one point the officers lost the vehicle, "[t]hat under these conditions of inconsistent speed, distance, and visibility, the officers claim to have observed an incomplete stop at a stop sign," and there is no video footage of the alleged incomplete stop.  Docket No. 84, pp. 4-5.  The government asserts that while pacing the Jeep by traveling 35 mph in a 30 mph zone, "Officer Gross estimated that the Jeep's speed was at 40-mph or greater."  Docket No. 83, p. 2.  The government also asserts that while attempting to initiate the traffic stop, Detective Gross observed the Jeep not come to a complete stop at a stop sign.  Id.

In Gaffney, a driver was stopped based on the officer's visual estimate that there was a speeding violation.  United States v. Gaffney, 789 F.3d 866, 867 (8th Cir. 2015).  The officer lacked experience in speed violations and could not remember whether he activated his radar.  Id. at 868.  The Eighth Circuit included analysis from Fourth Circuit case law: "[A]t a minimum, there must be sufficient indicia of reliability for a court to credit as reasonable an officer's visual estimate of speed."  Id. at 869 (quoting United States v. Sowards, 690 F.3d 583, 591-93 (4th Cir. 2012) (indicia of reliability may be supported by radar, pacing methods, or another officer's corroboration)).

The Eighth Circuit emphasized that "[t]he issue is whether the totality of the circumstances at the time of the stop supports the reasonableness of the officer's belief that [the defendant] was speeding at all." Id. at 869 (citing United States v. $45,000 in U.S. Currency, 749 F.3d 709, 715 (8th Cir. 2014)). The district court concluded that despite the disputed estimate of Gaffney's actual speed, the officer's belief that Gaffney was speeding was objectively reasonable. The officer was familiar with the area, Gaffney "braked hard" just after the officer began to follow him, and the investigator's measurement of speed averaged over the speed limit. Id. at 869-870. The Eighth Circuit affirmed, finding that the officer's "belief that Gaffney was speeding was objectively reasonable." Id. at 870.

In Green, an officer observed an SUV "that, based on his visual estimation, was speeding." United States v. Green, 946 F.3d 433, 436 (8th Cir. 2019). The defendant moved to suppress, arguing, among other things, that "the basis [of] the traffic stop was unlawful." Id. at 437. The Eighth Circuit held that while they "have cautioned that 'there must be sufficient indicia of reliability for a court to credit as reasonable an officer's visual estimate of speed,' we find the district court's determination that the SUV was speeding, based on [the officer's] credibility, training, and video evidence, is not clearly erroneous, and therefore [the officer] had probable cause to stop the vehicle." Id. at 438 (quoting Gaffney, 789 F.3d at 869).

Considering the totality of circumstances presented that night, the court concludes that the detectives had reasonable suspicion to initiate the traffic

stop of the Jeep based on the detectives' observations of speeding, failing to come to a complete stop at a stop sign, and the suspicious vehicle behavior in an area known for drug activity.

There were "sufficient indicia of reliability" that Detective Gross and Leacraft observed the Jeep speeding while pacing the vehicle. Gaffney, 789 F.3d at 869. Both detectives testified that while following the Jeep going 35 mph in a 30 mph zone, they observed the Jeep continue to pull away from them and estimated the Jeep's speed to be around 40 miles per hour. Docket No. 89, pp. 14, 89-90. Both detectives testified that this meant the car was exceeding their patrol car's speed, which was already over the posted speed limit. Id. This testimony is supported by the video evidence—when pausing and restarting the video footage taken from the front of the patrol car, the Jeep appears to be continually pulling away from the patrol car. Gov. Exhibit 1, 00:00-00:23. Both detectives testified that they had no reason to believe that the patrol vehicle's speedometer was inaccurate and added that whenever they passed a radar indicator on the road the speed in their patrol car appeared to be accurate. Docket No. 89, pp. 48-49, 79, 81, 119-120, 132. Detective Gross also testified that the GPS system in the patrol vehicle confirmed the accuracy of the patrol car's speedometer. Id. at 49. Based on the detective's testimony and video evidence, the court finds that the detective's visual observation of the Jeep speeding was reasonable.

"A search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake." Heien v. North Carolina,

574 U.S. 54, 57 (2014). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " Id. at 60-61 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)). Even if Detective Gross and Leacraft were slightly inaccurate on their estimation of the Jeep's speed, the court finds that any slight inaccuracy would have been negligible.

Beyond speeding, both detectives had reasonable suspicion that the Jeep failed to come to a complete stop at a stop sign. Again, "an officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation." Sallis, 507 F.3d at 649. Detective Gross testified that he could clearly see the Jeep's tires not come to a complete stop at any point. Docket No. 89, p. 59. Detective Gross testified that while the Jeep did slow down and the brake lights did come on, he could see that "its tires continued to roll through the entirety of the time I was watching it." Id. at 63. Detective Gross confirmed he could see this occurring because his "headlights were shining directly on" the tires when they were within a block from the Jeep. Id. at 65. Detective Gross stated that while there may have been a slight change in the vehicle's suspension at the stop sign, that was due to the Jeep accelerating, not because it came to a complete stop. Id. at 70, 73. This testimony was also reiterated and confirmed by Detective Leacraft. Id. at 90, 133.

While the court cannot confirm this testimony based on the video evidence provided, the court credits the testimony of the detectives. Both

detectives independently testified to the same facts—as the Jeep approached the intersection, it slowed down, but its tires remained in motion. On the scene, the patrol car was not much more than a block away from the Jeep when the detectives observed the incomplete stop, there were plenty of streetlights, and the patrol car's lights were also facing the Jeep. Based on the detective's testimony, the court finds that Detective Gross and Detective Leacraft had reasonable suspicion to stop the Jeep based on it failing to come to a complete stop.

Another fact that the court finds gave the detectives reasonable suspicion to initiate the traffic stop was the suspicious vehicle behavior in an area known for drug activity. This court must consider the totality of the circumstances prompting the detective's decision to initiate the traffic stop. Navarette, 572 U.S. at 396. The facts presented must be "viewed in light of the officer's experience and familiarity with drug trafficking." United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995) (citing United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990)). "Even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances." Id.

Both Detective Gross and Detective Leacraft testified that they were patrolling an area known for drug and gang activity on that evening. Docket No. 89, pp. 9, 89. While on patrol, both detectives testified that they observed a black Jeep pull behind a Buick SUV, a male passenger get out of the Jeep and into the SUV, drive a few blocks away, and after a short time the male got

16

back into the Jeep.  Id. at 10, 87.  Similar behavior occurred shortly after when another SUV pulled into the parking lot.  The same male exited the Jeep and went over to the driver's side of the SUV, and after a brief time, the male returned to the Jeep.  Id. at 10, 88.

Both detectives testified that based on their training and experience, these interactions were consistent with drug activity.  Id. at 11, 88.  Along with this belief, Detective Gross also testified that when they ran the license plate on the Jeep, they learned it was registered to someone known to be involved in illegal drug activity in Sioux Falls.[2]  Id.  Based on the totality of the circumstances and viewing these facts in light of the detective's experience on the Street Crimes unit, this suspicious vehicle behavior in an area known for drug activity would give the detective's reasonable suspicion to initiate the traffic stop.  This reasonable suspicion led the detectives to continue to follow the Jeep, whereupon they ultimately observed two traffic violations: speeding and failing to stop at a stop sign.  Therefore, Mr. Thomas' Fourth Amendment rights were not violated when the detectives initiated the traffic stop.

**B.     Whether the Warrantless Search of the Vehicle was Unconstitutional**

Mr. Thomas asserts the search of the Jeep was unconstitutional because the officers (1) did not have a search warrant, (2) did not secure consent to search from either the driver or Mr. Thomas, and (3) the search did not

---

[2] The registered owner of the Jeep turned out not to be the driver of the Jeep nor its passenger.  But reasonable suspicion is judged objectively from the standpoint of the information known to the officers at the time of effectuating the traffic stop.  Navarette, 572 U.S. at 396.

constitute a search incident to an arrest under <u>Arizona v. Gant</u>, 556 U.S. 332 (2009). Docket No. 84, pp. 5-6. The government argues the search was supported by probable cause and was permissible under the "automobile exception" and plain view doctrine to the warrant requirement. Docket No. 83, pp. 8-10. The court agrees with Mr. Thomas, and the government does not challenge, that a search warrant was not obtained, consent was not given, and neither the driver nor the defendant had been arrested at the time of the search. But in Mr. Thomas' circumstances, the "automobile exception" and plain view doctrine are more relevant.

The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted. <u>California v. Carney</u>, 471 U.S. 386, 390 (1985). But there are several exceptions to the warrant requirement, one being the "automobile exception." <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996) (per curiam); <u>United States v. Caves</u>, 890 F.2d 87, 89 (8th Cir. 1989).

The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity. <u>Labron</u>, 518 U.S. at 940; <u>Caves</u>, 890 F.2d at 89. Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a reduced expectation of privacy in an automobile because automobiles are subject to pervasive regulation. <u>Labron</u>, 518 U.S. at 940 (citing <u>Carney</u>, 471 U.S. at 390-

391); Caves, 890 F.2d at 89.  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Soderman, 983 F.3d 369, 375 (8th Cir. 2020) (quoting United States v. Murillo-Salgado, 854 F.3d 407, 418 (8th Cir. 2017)).

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there.  Caves, 890 F.2d at 90.  Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity."  United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983)).  When a search takes place without a warrant, the burden is on the government to demonstrate by a preponderance of the evidence that one of the exceptions to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

"The act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.' . . . Neither probable cause nor reasonable suspicion is necessary for an officer to look through a

window (or open door) of a vehicle so long as he or she has right to be in close proximity to the vehicle." United States v. Bynum, 508 F.3d 1134, 1137 (8th Cir. 2007) (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing Texas v. Brown, 460 U.S. 730, 740 (1983)), and citing United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999)).

The government argues the discovery of the marijuana seen in plain view in the driver's purse in the vehicle and the smell of marijuana emanating from the vehicle gave rise to probable cause to search under the "automobile exception" and plain view doctrine. Docket No. 83, p. 10.

### 1.    Did the Odor of Marijuana Give Rise to Probable Cause?

The government asserts the smell of marijuana coming from the vehicle gave rise to probable cause to search under the automobile exception. Docket No. 83, pp. 10-12. The Eighth Circuit "ha[s] repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception." United States v. Milk, 66 F.4th 1121, 1131 (8th Cir. 2023) (quoting United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020)); see also United States v. Smith, 789 F.3d 923, 928 (8th Cir. 2015); United States v. Barry, 394 F.3d 1070, 1078 (8th Cir. 2005); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000); United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000); United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999).

Although the legality of marijuana varies among the 50 states under state law, as of the writing of this opinion, marijuana is illegal under federal

law (Controlled Substances Act, 21 U.S.C. § 801) and illegal in South Dakota without a medical marijuana card.  See 21 U.S.C. § 812; SDCL §§ 22-42-6, 22-42-24, 24-20G-1.

Detective Gross testified that when he first approached the Jeep he could smell an odor of marijuana coming from the vehicle.  Docket No. 89, pp. 18-19, 27.  When Ms. Tschetter reached into her purse to obtain her driver's license, Detective Gross observed a clear ziplock bag of green leafy substance he believed to be marijuana.  Id. at 17-18.  Once Detective Gross had Ms. Tschetter step out of the vehicle, he asked Ms. Tschetter if there was marijuana in the car because he smelled and saw it and she confirmed that there was "ounce of marijuana in her purse."  Gov. Exhibit 2, 04:01.  Detective Gross then ascertained that Ms. Tschetter did not have a medical marijuana card.  Id. at 04:25.

At this point, Detective Gross' reasonable suspicion that there may be marijuana in the Jeep based on the odor and his sighting was confirmed by Ms. Tschetter.  This gave rise to probable cause to search the Jeep.  Milk, 66 F.4th at 1131.  Because Detective Gross had probable cause based on the initial odor of marijuana, his sighting of a clear baggie containing a green leafy substance, and Ms. Tschetter's confirmation of the presence of marijuana in the vehicle, the automobile exception allows the search to be conducted without a warrant or consent.  Soderman, 983 F.3d at 375.

**2.    Did Viewing the Marijuana in the Driver's Purse Give Rise to Probable Cause?**

The government also seeks to justify the warrantless search of the vehicle under the plain view exception.  Docket No. 83, p. 10.  The government argues that Officer Gross' observation of a bag of marijuana in the driver's purse gave rise to probable cause to search the vehicle.  Id.  "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.' " United States v. Class, 883 F.3d 734, 737 (8th Cir. 2018 (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).  Again, "[n]either probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has right to be in close proximity to the vehicle."  Bynum, 508 F.3d at 1137.

Detective Gross and Leacraft had a right to be in close proximity to the Jeep because they had reasonable suspicion to initiate the traffic stop based on speeding, failure to come to a complete stop at a stop sign, and because of the observed activity suggestive of drug trafficking.  While standing just outside the Jeep, Detective Gross testified that he could see a bag of green leafy substance that he suspected to be marijuana in Ms. Tschetter's purse.  The incriminating character of the suspected marijuana was immediately apparent to Detective Gross because marijuana is illegal under federal law.  See Controlled Substances Act, 21 U.S.C. § 801.  While it is true that it is legal to possess marijuana in South Dakota with a medical marijuana card, there is no medical

22

marijuana exception under federal law.  Detective Gross' suspicions were borne out by the marijuana odor he detected and by Ms. Tschetter's confirmation that she had marijuana in the vehicle.  Thus, the plain view doctrine applies and supplies an additional basis for the warrantless search.

## C.    Whether Mr. Thomas' Statements were Taken in Violation of <u>Miranda</u>

Mr. Thomas asserts that his statements were taken in violation of his rights under <u>Miranda</u>.  Docket No. 84, p. 6.  Under the Fifth Amendment, no defendant "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The holding of <u>Miranda</u> "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present: (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was in custody, with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  <u>See</u>

United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. See, e.g., United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Thomas' statements were not the subject of custodial interrogation on the government.

### 1. When was Mr. Thomas in Custody?

Miranda's first requirement is that Mr. Thomas be in custody. A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way." Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)). Absent formal arrest, a suspect is deemed to be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. Generally, routine on-the-scene questioning "does not present the compelling atmosphere inherent in the process of in-custody interrogation." United States v. Howard, 532 F.3d 755, 761 (8th Cir. 2008) (internal citations omitted).

The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468

24

U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  "(1) whether the suspect was informed that he was free to leave and that answering [the interrogator's questions] was voluntary; (2) whether the suspect possessed freedom of movement [during the interrogation]; (3) whether the suspect initiated contact [with the interrogator] or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere [of the interrogation] was police dominated; and (6) whether the suspect was [arrested] at the end of questioning."  United States v. Flores-Sandoval, 474 F.3d 1142, 1146-1147 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349).

Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.  In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the Griffin factors are not exhaustive

and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. Still, the Griffin factors still appear in Eighth Circuit case law after Czichray and continue to be cited with approval for determining the custody issue. See, e.g., United States v. Plumman, 409 F.3d 919, 923 (8th Cir. 2005).

In United States v. Rodriguez, 711 F.3d 928, 935 (8th Cir. 2013), the court found the defendant was not in custody during questioning at a traffic stop. In that case, the defendant was stopped after police observed his vehicle had no license plates and the registration had expired. Id. at 933. As the police officer approached Rodriguez's car, he saw a television and speakers in the back seat. Id. Rodriguez told the officer his driver's license was suspended but gave him his date of birth. Id. The vehicle was not registered either to Rodriguez or his passenger. Id. The officer returned to his patrol car to run a records search, leaving the two men in Rodriguez's car. Id.

While seated in his patrol car, the officer saw Rodriguez and the passenger reaching for the floorboard and looking back at the officer. Id. The records check revealed the car was registered to a third party and there was a possible felony arrest warrant outstanding for Rodriguez. Id.

Fearing for his safety, the officer called for backup. Id. When assistance arrived, the officers ordered Rodriguez out of his car. Id. The officer asked Rodriguez what he had been reaching for and Rodriguez told the officer there

26

was a handgun in the center console.  Id.  The officer then handcuffed
Rodriguez for officer safety, but told Rodriguez he was not under arrest.  Id.
The officer then put Rodriguez into his patrol car.  Id.  The officer asked
Rodriguez if there was any other contraband in his car, and Rodriguez
admitted there was a methamphetamine pipe under the driver's seat.  Id.  The
second officer similarly handcuffed the passenger and placed the passenger
into a separate patrol car.  Id.

On appeal, Rodriguez argued he was "in custody" for purposes of
Miranda as soon as the officer ordered him to exit his vehicle.  Id. at 935.  The
issue of whether Rodriguez was "in custody" when he was handcuffed and
seated in the back of the officer's patrol vehicle was not raised, briefed, or
argued on appeal.  Id. at 935 n.2.  As to the issue of whether Rodriguez was "in
custody" at the moment he was ordered to exit his car, the court held he was
not.  Id. at 935.  At that moment, the officer had legitimate concerns for his
own safety because of the reach for the floorboards, the nature of the car was
suspicious (no license plates and registered to a third party with different last
name than either Rodriguez or his passenger), and there was a possible felony
warrant for Rodriguez, for whom the officer had received no form of
identification.  Id.  Under these circumstances, the court held the officer was
justified under Berkemer and Terry in removing Rodriguez from the car and
securing him while the officer investigated further.  Id.

Mr. Thomas argues he was "in custody" when he was taken out of the
vehicle, placed in handcuffs, and informed that he was detained.  Docket

No. 84, p. 6.  Mr. Thomas argues that at that point all questioning became a custodial interview, and he should have been advised of his rights under Miranda.  Id.  The government argues that Mr. Thomas was "in custody" after officers discovered he had a weapon, marijuana, and suspected methamphetamine on his person and he was placed in the backseat of the officer's vehicles, by which time the Miranda advisements had been given to him.  Docket No. 83, pp. 15-16.

Reviewing the video evidence, Ms. Tschetter first informed Detective Gross that Mr. Thomas was on parole before Mr. Thomas stepped out of the Jeep.  Gov. Exhibit 2, 05:30.  Soon after, Detective Gross requested Mr. Thomas step out of the vehicle.  Id. at 06:15; Gov. Exhibit 4, 05:58. Detective Gross then asked Mr. Thomas if he had any weapons on him and Mr. Thomas confirmed that he had a gun on his hip.  Id. at 06:40.  Just after Mr. Thomas answered, Detective Gross began to grab Mr. Thomas' arm and move it away from his hip (where the gun was located) towards his head.  Id. at 06:42; Gov. Exhibit 1, 07:06.  This was also confirmed by Detective Gross' testimony that around this time, he was "controlling him."  Docket No. 89, p. 77.  It is at this moment, the court finds, that Mr. Thomas was "in custody."

Again, absent formal arrest, a suspect is deemed "in custody" where a reasonable person in the *suspect's position* would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442 (emphasis added).  Given the totality of the circumstances, a reasonable person in Mr. Thomas' position, knowing they are

28

on parole and having voluntarily confessed to having a firearm on their person, would believe they are not free to go.  This belief by Mr. Thomas was also supported once the detectives began to place Mr. Thomas' arms above his head and behind his back, and when Detective Gross stated, "he is on parole and has got a gun on his hip" to Detective Leacraft.  Gov. Exhibit 2, 06:48.  Therefore, any exculpatory or inculpatory statements made by Mr. Thomas in response to interrogation after being placed in custody and prior to being given his <u>Miranda</u> advisements will be suppressed.

### 2. Was Mr. Thomas Being Interrogated?

Interrogation includes direct questioning or any practice "reasonably likely to elicit an incriminating response from the suspect."  <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980); <u>see also</u> <u>United States v. Head</u>, 407 F.3d 925, 925 (8th Cir. 2005) (Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect).  The words or actions of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant.  <u>United States v. Wipf</u>, 397 F.3d 677, 685 (8th Cir. 2005) (citing <u>Innis</u>, 446 U.S. at 301).

A statement made by a suspect that is voluntary and not in response to interrogation is admissible with or without the giving of <u>Miranda</u> warnings.  <u>Head</u>, 407 F.3d at 925.  <u>Miranda</u> does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated

by the officer.  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).  In addition, polite conversation between the police and a defendant that is not steered toward potentially incriminating topics is not the functional equivalent of interrogation.  United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006); see also United States v. Fleck, 413 F.3d 883, 893 (8th Cir. 2005).

Mr. Thomas argues that several statements he made after he was taken out of the Jeep and placed in custody were incriminating, such as his probationary status, the legal status of the firearm, and the response given when the methamphetamine was found on his person.  The government argues that there were no "exculpatory or inculpatory statements made by Mr. Thomas in response to a question initiated by law enforcement during the period in which Mr. Thomas was placed in custody and when he waived his Miranda rights."  Docket No. 83, p, 17.  The court disagrees with the government.

Under Terry, officers are allowed to ask a suspect if he has any weapons and conduct a pat down search for weapons for safety purposes.  Terry, 392 U.S. at 30.  Further, routine booking-type questions are allowed without a Miranda warning and those are questions such as name, address, height, weight, eye color, date of birth, and current age (biographical data). Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990).  Thus, Detective Gross' initial question to Mr. Thomas whether he had a weapon was permissible under Terry.

That said, Detective Gross' questions whether Mr. Thomas was allowed to have a gun (Gov. Exhibit 2, 06:45) and whether the gun was "legal"

30

(Gov. Exhibit 2, 07:30) fall into neither category:  they have no bearing on officer safety concerns which animate the <u>Terry</u> holding and they are not routine biographical data such as allowed under <u>Muniz</u>.  These direct questions by Detective Gross are certainly "likely to elicit an incriminating response" by Mr. Thomas, and in fact did.  <u>Rhode Island</u>, 446 U.S. at 301.  Because Mr. Thomas was not provided his <u>Miranda</u> advisements before these questions were asked by Detective Gross, and because the court has concluded Mr. Thomas was in custody at the time the questions were posed, Mr. Thomas' responses to these questions by should be suppressed.

Mr. Thomas also made an inculpatory response to Detective Gross' statement, "that looks like meth right there."  Gov. Exhibit 2, 08:05.  Mr. Thomas argues that Detective Gross' statement was likely to elicit an incriminating response and in fact did when Mr. Thomas confirmed that it was methamphetamine on the scene.  The government argues that this statement by Mr. Thomas was unprompted, and both Detective Gross and Leacraft testified that this was not a question, but just a statement being made.

During Detective Gross' pat down search Mr. Thomas stated that he had marijuana in his front sweatshirt pocket.  Gov. Exhibit 2, 07:52.  When Detective Gross took the bag out of the front pocket, he held the bag up so Mr. Thomas could see it and stated, "that looks like meth right there."  <u>Id.</u> at 08:05; Gov. Exhibit 1, 08:31.  Detective Gross then paused, Mr. Thomas said, "yep," and Detective Gross said, "that's what it is."  <u>Id.</u> at 08:05-08:12.

Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect. <u>Head</u>, 407 F.3d at 925. The act of pulling out the bag of drugs, holding it up towards Mr. Thomas, stating that it looks like meth, and pausing would be reasonably likely to elicit an incriminating response from Mr. Thomas. Mr. Thomas' response stemmed from and was prompted by Detective Gross' statement. Therefore, because this response was given before Mr. Thomas was provided his <u>Miranda</u> advisements, the statement is suppressed.

Similarly, Mr. Thomas made an inculpatory response to Detective Gross' statement, "so you got a straw in there it looks like" while Detective Gross was continuing to conduct a pat down search. <u>Id.</u> at 09:23. Right after Detective Gross made this statement, Mr. Thomas admitted there was cocaine inside the straw. <u>Id.</u> at 09:25. Detective Gross testified that Mr. Thomas voluntarily made this statement, and it was not in response to any questions about the straw. Docket No. 89, p. 26. In response to the question, "[s]o he spontaneously – you find the straw, and he answers on his own, or he says a response on his own," Detective Gross testified, "yes." <u>Id.</u> Detective Gross' testimony is contradicted by the video evidence. <u>See</u> Gov. Exhibit 2 & 4.

Again, interrogation includes any words that Detective Gross should know are reasonably likely to elicit an incriminating response from Mr. Thomas. <u>Head</u>, 407 F.3d at 925. Mr. Thomas' admission to there being cocaine in the straw was only made in response to Detective Gross' statement.

Detective Gross' testimony shows that this statement to Mr. Thomas only came about because he "found a straw that contained a white powder in a bindle-type package." Docket No. 89, p. 22. All of this occurred while Mr. Thomas was standing in front of the patrol car in handcuffs, after he admitted to having a firearm, and after the detectives found marijuana and methamphetamine on his person. The detective's statement regarding the straw was reasonably likely to elicit an incriminating response. As was true with Mr. Thomas' admission regarding the methamphetamine, Mr. Thomas' admission to the presence of cocaine in the straw was a response to Detective Gross' statement. Therefore, because this response was given before Mr. Thomas was provided his <u>Miranda</u> advisements, the statement should be suppressed.

## CONCLUSION

Based on the facts, law, and analysis discussed above, this magistrate judge respectfully recommends granting in part and denying in part Mr. Thomas' motion to suppress [Docket No. 80] in accord with the preceding discussion. This court recommends that the physical evidence obtained from the vehicle and Mr. Thomas' person should not be suppressed. However, the court recommends that the statements Mr. Thomas made after being handcuffed and prior to being given <u>Miranda</u> warnings—statements about his parole status, whether the firearm was legal, whether he was in possession of methamphetamine and cocaine--should be suppressed.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 2nd day of June, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge